UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------------x
TROY LAMBE, SUNRAY SOLAR INC., and
MAX DIVERSIFIED INC.

                                                            Plaintiffs,

                                                                                        **AMENDED**
                                                                                        **COMPLAINT**
                            -against-

YOSSEF KAHLON, a/k/a JOSSEF KAHLON,
ATLAS SOLAR HOLDINGS LLC, ERICA T.
YITZHAK, THE LAW OFFICES OF ERICA T.
YITZHAK, and ERICA T. YITZHAK ESQ. P.C.                                                  **JURY TRIAL**
                                                                                        **DEMANDED**
                                                            Defendants.
-------------------------------------------------------------------------------------x

## INTRODUCTION

1.      Troy Lambe ("Lambe"), Sunray Solar, Inc. ("Sunray"), and Max Diversified Inc.

("Max") (collectively, "Plaintiffs") of New Jersey, by their attorney Richard J. Reisch, Esq., hereby

asserts the following against Yossef Kahlon a/k/a Josef Kahlon ("Kahlon"), Atlas Solar Holdings,

LLC, ("Atlas"), Erica T. Yitzhak, the Law Offices of Erica T. Yitzhak and Erica T. Yitzhak, Esq.

P.C. (collectively, "Yitzhak") (all Defendants collectively, "Defendants") in the above-entitled

action:

## JURISDICTION

2.      Jurisdiction of this court is invoked pursuant to the provisions of 28 U.S.C.A. § 1332.

3.      The amount in controversy, exclusive of interests and costs, exceeds $75,000.

## PARTIES

4.      Plaintiff Lambe, a natural person, now is, and at all times hereinafter mentioned was,

a resident of the State of New Jersey, residing at 546 South Cooks Bridge Road, Jackson, NJ 08527.

5.      Plaintiff Sunray now is, and at all times hereinafter mentioned was, a corporation duly organized and existing under the laws of New Jersey engaged in the business of selling and installing renewable solar energy systems, with its principal place of business located at 644 Cross Street, Suite 10, Lakewood, NJ 08701.

6.      Plaintiff Max now is, and at all times hereinafter mentioned was, a corporation duly organized and existing under the laws of New Jersey engaged in the business of selling and installing renewable solar energy systems, with its principal place of business located at 546 South Cooks Bridge Road, Jackson, NJ 08527.

7.      Upon information and belief, Defendant Kahlon, a natural person is, and at all times hereinafter mentioned was, a resident of New York State, residing at 9 Stream Court, Great Neck, New York 11023.

8.      Upon information and belief, Defendant Atlas is, and at all times hereinafter mentioned was, a corporation duly organized and existing under the laws of Delaware, with its principal place of business at 210 Fifth Avenue, Suite 401, New York, New York 10010.

9.      Upon information and belief, Defendant Erica T. Yitzhak, a natural person, is, and at all times hereinafter mentioned was, an attorney admitted to practice law in the State of New York, with offices for that practice located at 17 Barstow Road, Suite 406, Great Neck, New York 11021.

10.      Upon information and belief, Defendant The Law Offices of Erica T. Yitzhak is, and at all times hereinafter mentioned was, a corporation duly organized and existing under the laws of New York, with its principal place of business located at 17 Barstow Road, Suite 406, Great Neck, New York 11021.

11.      Upon information and belief, Defendant Erica T. Yitzhak, Esq. P.C. is, and at all times hereinafter mentioned was, a professional corporation duly organized and existing under the

2

laws of New York, with its principal place of business located at 17 Barstow Road, Suite 406, Great

Neck, New York 11021.

12.     At all times hereinafter mentioned, Defendants Erica Yitzhak, The Law Offices of

Erica T. Yitzhak, and Erica T. Yitzhak, Esq. P.C. will be collectively referred to as Defendant

Yitzhak.

## VENUE

13.     Defendants Jossef Kahlon, Erica T. Yitzhak, The Law Offices of Erica T. Yitzhak,

and Erica T. Yitzhak, Esq. P.C. reside within this district.  28 U.S.C. 1391(b)(1).

## GOVERNING LAW

14.     The FIRST, SECOND, THIRD, FOURTH, TENTH, and TWELFTH causes of action

are governed by New Jersey law.

15.     The FIFTH, SIXTH, SEVENTH, EIGHTH, NINTH, and ELEVENTH causes of

action are governed by New York law.

## FACTUAL BACKGROUND

16.     Plaintiff Lambe is the sole shareholder and principal officer of Plaintiffs Sunray and

Max.

17.     Upon information and belief, Defendant Kahlon is the sole and managing member of

Defendant Atlas.

18.     Upon information and belief, Defendant Erica T. Yitzhak is the principal of, and

managing member of The Law Offices of Erica T. Yitzhak and Erica T. Yitzhak, Esq. P.C.

19.     Between 2007 and 2013 Plaintiff Sunray was engaged in the sale and installation of

renewable solar energy systems.  All Sunray operations were, and are, conducted only in the state of

New Jersey.

20.     Between 2007 and 2013 Plaintiff Max was engaged in the business of renewable solar energy.  Max was incorporated under the law of the state of Florida in 1992.  In 1997, Max moved its operation, principal place of business, and state of incorporation to New Jersey.  All Max operations were, and are, conducted in the state of New Jersey.

21.     In and prior to 2010, Sunray would locate home and business owners who desired to have a renewable solar energy system installed on their property.

22.     After locating these home and business owners at its own expense, Sunray would complete an analysis and data reporting in order to facilitate a contract between the owners and Sunray to construct a solar energy system on the property.

23.     Sunray would process the system registration with the local board of public utilities, the local building departments, the local municipality, the local utility company, the State of New Jersey, and the United States Department of the Treasury.

24.     Sunray, at its own expense, would file for the necessary zoning and building permits for the system.

25.     Sunray would then order the materials for and install the system through Max.

26.     After completion of the installation, Sunray would ensure that the system was signed-off on by local and state inspectors to ensure that building and electrical codes are met.

27.     Within four to six weeks, the system's interconnection is generally approved.  Upon approval of interconnection, the system is active and can be registered with the New Jersey Generation Attributes System (GATS), the State's monitoring and generation system for Solar Renewable Energy Certificates (SRECs), a publicly-traded market commodity.

28.     SRECs are produced each time a solar system produces one thousand Watt-hours (Wh) or one Killowatt (equivalent).  For every 1 killowatt-hour of electricity produced by an eligible

4

solar facility, one SREC is awarded.  The value of an SREC is determined by the market, subject to supply and demand constraints.

29.     Plaintiffs met Defendants Kahlon and Atlas in or around 2010.  Beginning in or around 2011, Plaintiffs entered into a series of agreements with Defendants Kahlon and Atlas whereby Defendants Kahlon and Atlas would fund the installation of these renewable solar energy systems on third parties' properties (the "Systems").  Defendants Kahlon and Atlas were to pay Plaintiff in funding cycles based on the number of installations completed in any given week. Plaintiffs would perform the functions outlined above.  In return, Defendants Kahlon and Atlas would be entitled to, during the first fifteen years, to the SRECs generated by the Systems in addition to other tax benefits, revenues and grant monies.

30.     Ultimately, the Defendants invested in, and closed on, twenty-six Systems with Plaintiffs, all of which were installed by Plaintiff in a timely manner.

31.     In anticipation of these installations, the parties entered into a series of agreements entitled *Contractor Installation and Completion Guarantee.*

32.     Pursuant to these agreements, Defendants Kahlon and Atlas would fund the installation of the Systems and Plaintiffs guaranteed prompt installation and completion of the Systems.

33.     The "prompt installation and successful completion" of each installation was guaranteed by the assets of Plaintiffs.  Plaintiffs' assets were only pledged as a guarantee of installation.  No other agreement regarding Plaintiffs' assets were entered into by the parties.

34.     All 26 Systems were installed and successfully completed.

35.     The final installation was completed on November 26, 2011.

36.     The installation of all 26 Systems were signed-off on by local and state inspectors to ensure that building and electrical codes were met.

37.     The final interconnection was approved on November 21, 2011.

38.     The final GATS approval was received on May 8, 2012.

39.     The total amount of funding provided by Defendants for these 26 Systems was $1,650,785, paid out over nine funding cycles.

40.     In addition, Sunray and Atlas entered into a *Solar Energy System Maintenance Agreement* whereby Sunray would continue to service and maintain the Systems it had installed, and which had been funded by Atlas.  In return, Atlas would pay to sunray "seven-and-one-half percent (7.5%) of the Power Purchase Agreement (PPA) revenue collected from, and seven-and-one-half of the net sales proceeds of Solar Renewable Energy Certificates (SRECs) generated by the solar energy systems held in Atlas Solar's names that are funded by Atlas Solar and installed by Sunray."

41.     Per the *Solar Energy System Maintenance Agreement*, disputes arising from the agreement shall be governed in accordance with the laws of the State of New York.

42.     Defendants Kahlon and Atlas have received ownership rights to all twenty six systems.  The systems GATS and SRECs are all registered as the property of Defendants Atlas and Kahlon and Defendants Atlas and Kahlon received and, upon information and belief, continue to receive, all revenue and grant monies from these systems.

43.     Defendants Kahlon and Atlas have received funds for the successful completion of these systems, including $495,236.13 in grant money from the United States Department of the Treasury, $40,120.88 for the first year PPA payments from contracted customers, and money from the sale of SRECs, the exact amount of which is not known at this point.

44.     In or around August 2011, the price of SRECs in New Jersey, due to market factors beyond the parties' control, suffered a significant drop in price.  This drop was the result of New Jersey Governor Chris Christie withdrawing the state from the Regional Greenhouse Gas Initiative, a cap-and-trade program.

45.     Shortly thereafter, in August 2011, during the ninth funding cycle, Defendants Kahlon and Atlas cut off funding for the systems.  At this time, Plaintiff returned $133,655.00 to Defendants Kahlon and Atlas for the ninth cycle's invoices despite Plaintiffs being contractually obligated to install the systems.  Defendants Kahlon and Atlas have made no payments since that time.

46.     Defendants Kahlon and Atlas have made no payments to Plaintiffs under the *Solar Energy System Maintenance Agreement* despite Plaintiffs having serviced and maintained the systems.

47.     In or prior to June 2012, Defendants Kahlon and Atlas retained the professional legal services of Defendant Yitzhak.

48.     On June 28, 2012, Defendant Yitzhak filed at least two separate liens on Plaintiffs' assets in Ocean County, New Jersey.  No notice of these liens was provided to Plaintiffs.

49.     Upon information and belief, Defendant Yitzhak was operating as an agent of Defendants when she filed these liens.

50.     After Defendant Kahlon ceased all funding of Plaintiffs' solar energy installation projects, Plaintiffs' sought out alternate investors to fund the installations.

## NJR Clean Energy Ventures Corporation

51.     Beginning in early 2012, after Defendant Kahlon ceased funding Plaintiffs' solar energy installation projects, Plaintiffs sought other investors and began negotiations with NJR Clean Energy Ventures Corporation ("NJR") for NJR to fund Plaintiffs' installations.

52.     On October 19, 2012, Plaintiff Sunray and NJR signed an agreement entitled *Turnkey Residential Solar System Installation Agreement* ("NJR Install Agreement").  Under the terms of this agreement, NJR would provide funding for Plaintiffs' installations of solar energy systems.

53.     Under the terms of the agreement, Plaintiffs would act as an independent authorized representative of NJR; identifying and qualifying potential residential customers in New Jersey to enter into solar equipment leases, designing, constructing and installing the systems, ensuring interconnection of the systems, in addition to other responsibilities.

54.     Between October 19, 2012 and February 5, 2013, Plaintiffs performed all of their responsibilities on 62 solar energy systems, funded by NJR.

## Clean Power Finance

55.     Beginning in early 2012, Plaintiffs began negotiation with another entity, Clean Power Finance ("CPF"), for CPF to fund Plaintiff's installations.

56.     In 2012, Plaintiff Sunray and Clean Power signed an agreement.  Under the terms of this agreement, CPF would provide funding for Plaintiffs' installations of solar energy systems.

57.     In November, 2012, Plaintiff Sunray and CPF signed an agreement.  Under the terms of this agreement, CPF would provide funding for Plaintiffs' installations of solar energy systems. Under the terms of the agreement, Plaintiffs would act as an independent authorized representative of CPF; identifying and qualifying potential residential customers in New Jersey to enter into solar

equipment leases, designing, constructing and installing the systems, ensuring interconnection of the systems, in addition to other responsibilities.

## NRG Energy

58.     Beginning in early 2012, Plaintiffs began negotiation with NRG Energy ("NRG") for NRG to fund Plaintiff's installations.

59.     In 2012, Plaintiff Sunray and NRG signed an agreement.  Under the terms of this agreement, NRG would provide funding for Plaintiffs' installations of solar energy systems.

60.     Under the terms of the agreement, Plaintiffs would act as an independent authorized representative of NRG; identifying and qualifying potential residential customers in New Jersey to enter into solar equipment leases, designing, constructing and installing the systems, ensuring interconnection of the systems, in addition to other responsibilities.

61.     Between October, 2012 and February 5, 2013, Plaintiffs performed all of their responsibilities on 8 solar energy systems, funded by NRG.

## The September 19, 2012 letter from Erica Yitzhak

62.     On September 19, 2012 Defendant Yitzhak, while acting as an agent of Defendants Kahlon and Atlas, sent a letter to Plaintiffs informing them that liens had been placed on all of their assets and falsely alleging that Plaintiffs owed money to Atlas.

63.     This letter was the first time that Plaintiffs had been informed that liens had been placed on their all of their assets and personal property by Defendants.

64.     The liens against Plaintiffs assets and personal property had been filed on June 28, 2012 without Plaintiffs' knowledge or approval.

65.     The letter further demanded that unless Plaintiffs pay to Defendants the sum of $1,874,165 by September 30, 2012, Defendants would commence legal action against Plaintiffs.

66.     The letter claimed that the amount demanded was owed under "various agreements." However, no reference to, or basis for, these agreements was stated.

67.     The letter threatened that Defendants would bring a lawsuit against Plaintiffs for "breach of contract, fraud and fraudulent inducement to enter into contract."

68.     Lastly, the letter threatened that, in the case of litigation, Plaintiffs would be liable for "treble punitive damages" in addition to the amount allegedly owed under the various agreements.

### Service of the Summons and Complaint on Plaintiffs by Erica Yitzhak

69.     On October 22, 2012, Plaintiffs were served with a Summons and Complaint by Defendants (Supreme Court of the State of New York, County Of New York, Index No. 157465/2012).

70.     On December 4, 2012, Plaintiffs filed a Demand for Complaint and Notice of Appearance in that action.

71.     On February 5, 2013, Defendants served the complaint in that action.  Included with the Complaint was an Affirmation of Service from Erica T. Yitzhak stating that the Complaint was served on December 18, 2012.

### The January 30, 2013 letter from Erica Yitzhak

72.     On January 30, 2013, Defendant Yitzhak, while acting as an agent of Defendants Kahlon and Atlas, sent a letter via mail to all three of Plaintiff's financial partners: NJR, Clean Power, and NRG.

73.     The letter informed the recipients that Defendants were holders of liens recorded against Plaintiffs.

74.     The letter further informed Plaintiffs' financial partners that legal action had been commenced against Plaintiffs.

10

75.     The letter also falsely claimed that Defendant Atlas had suffered losses "as a result of Mr. Lambe and Sunray Solar Inc.'s fraudulent and deceitful actions."

76.     The letter requested that Plaintiffs' financial partners "refrain from forwarding any payments, credits, remittances or any other transfers of assets or resources involving Sunray Solar Inc., any of its affiliates and Mr. Lambe at this time."

77.     A copy of the complaint filed against Plaintiffs in New York County as well as copies of the liens of Plaintiffs' assets were included with the letter.

78.     On February 5, 2013, the same day that Plaintiffs' investors received the letter from Defendants, all three of Plaintiffs' investors individually contacted Plaintiff.

79.     NJR informed Plaintiffs that they would be terminating their agreement with Plaintiffs, effective immediately as a result of this letter.

80.     Clean Power informed Plaintiffs that they would not be moving forward with their funding of solar energy systems until the litigation with Defendants had been resolved.

81.     NRG informed Plaintiffs that they would not be moving forward with their funding of solar energy systems until the litigation with Defendants had been resolved.

82.     On February 7, 2013, NJR sent Plaintiffs written confirmation that they were terminating their agreement with Plaintiffs, effective immediately.

83.     Pursuant to the termination agreement, NJR took possession of all work performed by Sunray under the NJR Install Agreement.  For the 7 leases partially executed, Plaintiffs were offered a reduced fee and did not receive any fees for their services.  For the 53 partially executed leases that had been generated by Plaintiffs, Plaintiffs were offered to receive a further reduced fee and did not receive any fees for their services.

11

84.     At the time of the termination of the NJR Install Agreement, Plaintiffs had approximately 300 additional properties in their pipeline that Plaintiffs anticipated would be funded by NJR, Clean Power or NRG pursuant to Plaintiffs' agreements with those investors.

85.     Since the Plaintiffs' investors terminated their funding of Plaintiffs' installations, Plaintiff has been unable to complete any installations.

## AS AND FOR A FIRST CAUSE OF ACTION
## (TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE)

86.     Plaintiffs repeat, reallege, and incorporate by reference the allegations in all of the above paragraphs with the same force and effect as if herein set forth.

87.     Plaintiffs had existing business relationships with NJR, Clean Power, and NRG.

88.     Defendants, through their letter to NJR, Clean Power, and NRG interfered with Plaintiffs' business relationships.

89.     Defendants, in sending the January 30, 2013 letter to Plaintiffs' investors, acted with the intention and purpose of harming the Plaintiffs' relationships with these investors, interfering with existing contracts with investors, and interfering with Plaintiffs' economic advantage.

90.     Defendants used wrongful means when contacting the Plaintiffs' investors, accusing Plaintiffs of fraud and deceit, and requesting the investors not to forward any funding to Plaintiffs.

91.     Defendants' acts were without justification or excuse.

92.     As a direct result of Defendants' acts, Plaintiffs business relationships with their investors has been harmed in that all three investors have either terminated or suspended their relations with Plaintiffs as a direct result of Defendants' letter.

93.     Plaintiffs have suffered significant harm as a result of Defendants' actions including loss of profit, loss of goodwill, loss of contractual benefits, negatively affected credit scores, and loss of business.

94.     Due to Defendants' actions, Plaintiffs have been rendered unable to continue their operations, have had to lay off workers, lost significant revenue, and have effectively been forced to close their businesses.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS)**

95.     Plaintiffs repeat, reallege, and incorporate by reference the allegations in all of the above paragraphs with the same force and effect as if herein set forth.

96.     Plaintiffs had valid existing contractual relations with NJR, Clean Power, and NRG.

97.     Defendants clearly had knowledge of these contracts as indicated by the January 30, 2013 letter.

98.     On February 5, 2013, NJR, Clean Power, and NRG breached their respective contracts with Plaintiffs by terminating their funding of Plaintiffs' installations of solar systems.

99.     Defendants' defamatory and untrue allegations contained in the January 30, 2013 letter was intended to induce Plaintiffs' investors to breach their contracts with Plaintiffs.

100.    As a direct result of Defendants' acts, Plaintiffs contractual relations with their investors have been harmed in that all three investors have either terminated or suspended their relations with Plaintiffs as a direct result of Defendants' letter.

101.    Plaintiffs have suffered significant harm as a result of Defendants' actions including loss of profit, loss of goodwill, loss of contractual benefits, negatively affected credit scores, and loss of business.

102.    Due to Defendants' actions, Plaintiffs have been rendered unable to continue their operations, have had to lay off workers, lost significant revenue, and have effectively been forced to close their businesses.

## AS AND FOR A THIRD CAUSE OF ACTION
## (TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC
## RELATIONS/ADVANTAGES)

103.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in all of the above paragraphs with the same force and effect as if herein set forth.

104.    Plaintiffs had an expectation of prospective economic advantage and future business relations with NJR, Clean Power, NRG, and with others.

105.    Defendants, through their letter to NJR, Clean Power, and NRG interfered with Plaintiffs' prospective business relationships with those investors, and with others.

106.    Defendants, in sending the January 30, 2013 letter to Plaintiffs' investors, acted with the intention and purpose of harming the Plaintiffs' prospective relationships with the investors, interfering with prospective contracts with investors, and interfering with Plaintiffs' prospective economic advantage.

107.    Defendants used wrongful means when contacting the Plaintiffs' investors, falsely accusing Plaintiffs of fraud and deceit, requesting the investors not to forward any funding to Plaintiffs, and through the filing of liens and lawsuits.

108.    Had it not been for Defendants' acts, Plaintiffs would have entered into new contracts for the additional 300 properties with investors that Plaintiffs had in their pipeline at the time of the letter.

109.    Defendants' acts were without justification or excuse.

110.    As a direct result of Defendants' acts, Plaintiffs' prospective business relationships with their investors has been harmed in that all three investors have either terminated or suspended their relations with Plaintiffs as a direct result of Defendants' letter.  Further, Plaintiffs are also unable to enter into relations with new investors.

111.    Plaintiffs have suffered significant harm as a result of Defendants' actions including loss of prospective profit, loss of prospective goodwill, loss of prospective contractual benefits, and loss of prospective business.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (DEFAMATION/TRADE LIBEL)

112.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in all of the above paragraphs with the same force and effect as if herein set forth.

113.    Defendants' statements in the January 30, 2013 letter claiming that Plaintiffs committed "fraudulent and deceitful actions" were false and defamatory statements concerning Plaintiffs.

114.    The statements were slander *per se* as it accused Plaintiffs of engaging in conduct incompatible with their business.

115.    By sending the letter to Plaintiffs' investors, Defendants published the defamatory statements to third parties.

116.    This publication to Plaintiffs' investors was unprivileged.

117.    Defendants acted with malice in publishing the statement to Plaintiffs' investors.

118.    Defendants acted at least negligently in failing to ascertain the truth of the statement.

119.    Defendants in making the disparaging, defamatory statement intended to prevent investors from dealing with Plaintiffs.

120.    The statement was injurious to the reputation of Plaintiffs to their investors and to others in their field.

121.    The statement has exposed Plaintiffs to loss of good will, loss of reputation, and the loss of confidence in which they were held by their investors.

122.    Plaintiffs have suffered damages resulting from Defendants' defamatory statements including loss of goodwill, loss of business relations, loss of profits, loss of reputation and confidence in their industry, negatively affected credit scores, and it has caused investors to avoid dealing with Plaintiffs.

**AS AND FOR A FIFTH CAUSE OF ACTION
(MALICIOUS USE/ABUSE OF PROCESS)**

123.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in all of the above paragraphs with the same force and effect as if herein set forth.

124.    Defendants commenced a lawsuit against Plaintiffs by filing a Summons with Notice on October 22, 2012 in the Supreme Court of the State of New York, County Of New York (Index No. 157465/2012).

125.    Defendants' intention in filing this lawsuit was to harm Plaintiffs' businesses and relationships with investors.

126.    Defendants' further intention in filing this lawsuit was to compel Plaintiffs to pay monies that Defendants are not entitled to.

127.    Defendants filed this lawsuit without excuse or legal justification.

128.    Defendants demanded relief well in excess of which they would be legally entitled, even if they are entitled to relief.

129.    Defendants demanded this excessive relief, to which they are not legally entitled, with the intention of compelling Plaintiffs to pay monies.

130.    Defendant Yitzhak filed a back-dated Affirmation of Service with the Supreme Court of the State of New York, County Of New York.

131.    Defendants filing of the lawsuit in the Supreme Court of the State of New York, County Of New York, was a malicious and unjustified use of the court system.

## AS AND FOR A SIXTH CAUSE OF ACTION
## (VIOLATION OF NEW YORK JUDICIARY LAW § 487)

132.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in all of the above paragraphs with the same force and effect as if herein set forth.

133.    Defendants filed a lawsuit against Plaintiffs on October 22, 2012 in the Supreme Court of the State of New York, County Of New York (Index No. 157465/2012).

134.    Defendant Yitzhak was the attorney that filed this lawsuit on behalf of Defendants Kahlon and Atlas.

135.    Plaintiffs were named as defendants in that lawsuit.

136.    On January 29, 2013, Defendant Yitzhak attempted to deceive the Supreme Court of the State of New York, County of New York, by filing a fictitious Affirmation of Service indicating that the complaint in that action had been served on Plaintiffs on December 18, 2012, which would have been within the statutory period allowed for service under N.Y. C.P.L.R. § 3012(c).

137.    The complaint in that action was actually served on the Plaintiffs on February 5, 2013, 43 days after the period for service had ended.

138.    This was a material misrepresentation of an existing fact.

139.    Defendant Yitzhak filed this deceptive Affirmation of Service with knowledge of its falsity.

140.    As a result of Defendant Yitzhak's attempt to deceive the court, Plaintiffs have suffered and continue to suffer damages from being required to expend significant amounts of money to litigate that action as well as damages from not being able to resume business relationships with his investors during the pendency of that action.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (NEGLIGENCE)

141.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in all of the above paragraphs with the same force and effect as if herein set forth.

142.    Defendant Yitzhak owed a duty of care to Plaintiffs to conform her actions to the standard of care expected of a licensed attorney.

143.    Defendant Yitzhak failed to exercise the level of care expected of a licensed attorney when she negligently failed to determine the legal validity of the fraud claim filed against Plaintiffs.

144.    Defendant Yitzhak failed to exercise the level of care expected of a licensed attorney when she negligently failed to investigate the merits of the breach of contract claim against Plaintiffs.

145.    Had Defendant Yitzhak researched the requirements of a fraud claim prior to filing suit against Plaintiffs, as is required of a licensed attorney prior to filing such a claim, she would have learned that there was no legal basis for such claim.

146.    Had Defendant Yitzhak researched the merits of the breach of contract claim prior to filing suit against Plaintiffs, as is required of a licensed attorney prior to filing such a claim, she would have learned that there was no merit to such claim.

147.    Had Defendant Yitzhak researched the validity of the fraud and breach of contract claims against Plaintiffs, Defendant Yitzhak would not have sent letters to Plaintiffs' investors making falsely and damaging accusations.

148.    As a result of Defendant Yitzhak's failure to exercise the care expected of a member of the legal community, Plaintiffs have suffered harm from the defamatory letters sent to Plaintiff's investors.

149.     The harm suffered by the Plaintiffs was the reasonably foreseeable result of sending the January 30, 2013 letter and of filing a meritless lawsuit.

150.     Plaintiffs have suffered actual damages to their business relationships with their investors, lost profits, lost expected profits, loss of goodwill, loss of the confidence in which others held in the Plaintiff, negatively affected credit scores, and an inability to resume their regular business relationships and activities.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (PROFESSIONAL MALPRACTICE/NEGLIGENCE)

151.     Plaintiffs repeat, reallege, and incorporate by reference the allegations in all of the above paragraphs with the same force and effect as if herein set forth.

152.     Defendant Yitzhak's filing of the back-dated Affirmation of Service was a fraudulent and malicious act aimed at Plaintiffs.

153.     Had Defendant Yitzhak not committed the fraudulent and malicious acts, Plaintiffs would not have suffered damages.

154.     As a result of Defendant Yitzhak's fraudulent and malicious act aimed at Plaintiffs, Plaintiffs have suffered and continue to suffer damages from being required to expend significant amounts of money to litigate that action, negatively affected credit scores, as well as damages from not being able to resume business relationships with his investors during the pendency of that action.

## AS AND FOR AN NINTH CAUSE OF ACTION
### (BREACH OF CONTRACT)

155.     Plaintiffs repeat, reallege, and incorporate by reference the allegations in all of the above paragraphs with the same force and effect as if herein set forth.

156.     The *Solar Energy System Maintenance Agreement* between Plaintiffs and Defendants Kahlon and Atlas was a valid, enforceable contract.

157.    Plaintiffs have performed, and continued to perform, all of their contractual obligations under the *Solar Energy System Maintenance Agreement.*

158.    By not making any of the required payments to Plaintiffs, Defendants Kahlon and Atlas have breached the *Solar Energy System Maintenance Agreement*.

159.    Plaintiffs have requested payment from Defendants Kahlon and Atlas.  Such requests have been denied.

160.    Plaintiffs have sustained, and will continue to sustain for the duration of the *Solar Energy System Maintenance Agreement*, damages from Defendants' refusal to pay the 7.5% of the revenue share from the PPAs as required.

## AS AND FOR A TENTH CAUSE OF ACTION
### (BREACH OF CONTRACT)

161.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in all of the above paragraphs with the same force and effect as if herein set forth.

162.    Plaintiffs and Defendants Kahlon and Atlas had a valid enforceable contract whereby Defendants Kahlon and Atlas would continue to fund Plaintiffs installation of solar energy systems.

163.    Defendants Kahlon and Atlas induced Plaintiffs to expend significant time, energy, and resources in signing up additional home and business owners for solar energy systems.

164.    Defendants Kahlon and Atlas consistently represented to Plaintiffs that if Plaintiffs were to sign up more home and business owner for solar energy systems, that Defendants would continue to fund the installations.

165.    Plaintiffs reasonably relied on Defendants Kahlon and Atlas' representations that they would continue to fund the installations.

166.    Plaintiffs performed all of the preliminary work in signing up home and business owners for solar energy systems.

167.    Plaintiffs expended significant time, money, and energy in performing under this agreement.

168.    Plaintiffs obtained permits, produced technical data and reports, and procured Board, state, utility and zoning approvals for these systems.

169.    By cutting off all funding to Plaintiffs, Defendants Kahlon and Atlas failed to perform their duties under this agreement.

170.    At the time the Defendants Kahlon and Atlas cut off funding for the installations, the yet to be completed solar energy systems would have provided approximately $20,000,000 in income, of which Plaintiffs would have been entitled to 22%.

171.    Defendants Kahlon and Atlas have made no payments to Plaintiffs for the work Plaintiffs performed under this contract although duly demanded.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (PRIMA FACIE TORT)

172.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in all of the above paragraphs with the same force and effect as if herein set forth.

173.    Defendants intentionally and maliciously inflicted harm upon the Plaintiffs when they sent the January 30, 2013 letter to Plaintiffs' investors.

174.    Defendants' actions in sending the letters was without any excuse or justification as the claims in the letters were without legal basis and did not serve any legitimate interest of Defendants.

175.    As a result of Defendants' intentional and malicious acts, Plaintiffs have been harmed.

176.    Plaintiffs have suffered special damages in the amount expended procuring the leases for solar energy systems.

21

## AS AND FOR A TWELFTH CAUSE OF ACTION
## (UNAUTHORIZED FILING UCC FINANCING STATEMENT)

177.    Defendants' conduct did not conform with the statutory requirements of the Uniform Commercial Code.

178.    Defendants filed UCC Financing Statements against "any and all assets, including bank accounts of Troy Lambe, the real property located at 546 South Cooksbridge Road, Jackson, NJ 08527" against Plaintiff Lambe.

179.    Defendants' filed UCC Financing Statements against "any and all assets, including fixtures and filings of Sunray Solar Inc. and Max Diversified Inc." against Plaintiffs Sunray and Max.

180.    These financing statements were filed more than 9 months after the final installation was completed.

181.    All installations were completed in a prompt manner and signed off on by all parties.

182.    At the time that the financing statements had been filed, all of Plaintiffs' obligations had been satisfactorily discharged.

183.    The financing statements were filed after all work had been completed, interconnectivity had occurred, permits had been acquired, approvals from all agencies had been granted, and after Defendants Kahlon and Atlas had taken legal ownership to all systems.

184.    Defendants did not have a right to file the UCC Financing statement once the systems had been installed and successfully completed.


WHEREFORE, Plaintiff demands judgment against all the above-named Defendants for the FIRST, SECOND, THIRD, FOURTH, ELEVENTH, and TWELFTH causes of action, jointly and severally, for actual, general, special, and compensatory damages in an amount to be determined at

trial, believed to be in excess of $14,600,000, and further demands statutory damages in the amount of $1,000, and further demands equitable relief in the form of a declaration that the liens against Plaintiffs' assets are invalid.  Plaintiff further demands judgment against Defendant Yitzhak for the FIFTH, SIXTH, SEVENTH, and EIGHTH causes of action for actual, general, special, and compensatory damages in an amount to be determined at trial, believed to be in excess of $4,000,000, and further demands treble punitive damages for the FIFTH cause of action.  Plaintiff further demands judgment against Defendants Kahlon and Atlas for the NINTH and TENTH causes of action for actual, general, special, and compensatory damages in an amount to be determined at trial, believed to be in excess of $4,500,000.

Dated: Carle Place, New York
      August 27, 2013            **/s/ Richard J. Reisch**
                                      RICHARD J. REISCH
                                      Attorney for Plaintiff
                                      One Old Country Road - Suite PL09
                                      Carle Place, NY 11514
                                      (516) 742-4949
                                      (516) 742-1977 (fax)